UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

| | |
|---|---|
| CAMILA DUBAY, | AMENDED COMPLAINT |
| Plaintiff, | 07 CV 5638 |
| v. | |
| FORD MODELS, INC., CONDE' NAST, INC., | |
| Defendants. | |

------------------------------------------------------------

## AMENDED COMPLAINT

The plaintiff, Camila Dubay, by and through her attorney David E. Aronow, Esq. alleges as follows:

### BACKGROUND

1. Ms. Dubay is a citizen of Brazil.

2. Both defendants are Delaware corporations authorized to do business in the State and County of New York. Defendant, Conde' Nast, Inc., owns a magazine called Teen Vogue. Defendant Ford Models, Inc. owns and operates a model management business.

3. This court has diversity of citizenship jurisdiction under 28 USC §1332 (a)(2),(b) as the amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship between plaintiff and the defendants.

4. Ms. Dubay is a fashion model, and she entered into a contract with defendant Ford Models, Inc., ("Ford"), pursuant to a written agreement dated June 9, 2002. A true copy is attached hereto as Exhibit A.

5. In the agreement, among other things, Ford was appointed Ms. Dubay's exclusive manager, agent and attorney-in-fact to negotiate and execute **all** contracts for modeling and to collect compensation on behalf of Ms. Dubay. In exchange, Ms. Dubay agreed to compensate Ford, among other things.

6. As a result of the appointment as her exclusive managing agent, Ford owed Ms. Dubay a fiduciary duty to deal fairly toward Ms. Dubay. In addition, Ford owed Ms. Dubay an obligation of good faith as a result of entering into the agreement.

7. After execution of the "Ford Models Management Agreement" ("Agreement") in September 2002, Ford sent Ms. Dubay on a substantial number of castings on a routine and daily basis. As a result, Ford procured substantial work for Ms. Dubay and Ms. Dubay made in excess of $150,000 in period of approximately one year after the execution of the agreement.

8. In or about the fall of 2002, Teen Vogue, a magazine owned by defendant Conde' Nast, Inc., ("CD"), "booked" or contracted with Ford to use Ms. Dubay for an "editorial" job wherein CD was to take and use photos of Ms. Dubay's likeness for an article in CD's Teen Vogue Magazine.

9. It was and is customary and usual in the trade that a low or *de minimus* "editorial" rate would be paid when a magazine publisher hired a model to appear in its magazine for a story created by the publisher. Also customary in the trade is that photos used for advertisements, on the other hand, were highly valued and paid a much better rate: they were usually several orders of magnitude higher.

10. Ms. Dubay performed the editorial contract. The photos were used in CD's Teen Vogue for a story in that magazine. CD remitted to Ford the editorial rate for the job.

11. Ford remitted to Ms. Dubay the very low de minimus "editorial" rate for the editorial job with Teen Vogue. Ms. Dubay was told that the photo would be used for "editorial." Ms. Dubay had no reason to doubt Ford and reasonably relied on the representation of Ford.

12. Some time later, CD published various advertisements for its Teen Vogue magazine. In the advertisements, CD prominently used the identical photograph of Ms. Dubay that CD used for the prior editorial. See Exhibit B, the advertisement CD used without compensation. CD did not pay an additional sum for the right to use this photograph for advertisement purposes.

Termination

13. Starting in or about December 2003, Ford completely or substantially stopped sending Ms. Dubay on castings for modeling work. Ford offered no reason for doing so except that Ford said that Ms., Dubay's "look" was not right for the castings they were sending girls to.

14. As a result Ms. Dubay was unable to earn further monies and as she was under an exclusive agreement with Ford and her work visa was only valid to work through Ford.

15. Nothing changed until Ford asked Ms. Dubay to work in Japan in or around May 2004. As a result, Ms. Dubay went to Japan and worked there until approximately the end of June 2004.

16. After returning from Japan, Ford did not send Ms. Dubay on any castings for work. After one month, Ms. Dubay inquired as to why she was not being sent on castings. In response, she was told that Ford would no longer represent her.

17. Afterwards, Ms. Dubay went to another agency and found regular work as a result of their combined efforts.

18. In addition, after she was no longer represented by Ford, Ms. Dubay learned from her clients and others that such clients and other perspective clients had been interested in hiring Ms. Dubay for work during the time that Ford was not sending Ms. Dubay on castings and when she was in Japan. These people reported that Ford claimed Ms. Dubay was in Brazil and not working in New York. This was false as Ford fully knew. As a result, Ms. Dubay lost substantial work and monies which she would have received had Ford performed the agreement in good faith.

## COUNT I (ACCOUNTING)

19. Ms. Dubay demands an accounting from Ford.

## COUNT II (BREACH OF FIDUCIARY DUTY)

20. Plaintiff repeats and re-alleges the prior allegations herein. Ms. Dubay demands damages for Ford's breach of fiduciary duty. Ford simply failed to deal fairly and comply with its fiduciary obligation by both failing to obtain any consideration for the use of Ms. Dubay's photograph for advertisement use by CD in its Teen Vogue magazine or disclosing that it was executing a release to CD for that photo for any purpose.

21. At the time of this event, Ms. Dubay was being paid very large sums of money from other clients for the use of her photos for advertisement. Ford was well aware of this fact as it booked those other jobs. Ford knew that the release to use the photo of Ms. Dubay that it gave to CD had substantial value. Ford denied that it received any consideration for the advertisement photo for Ms. Dubay.

22. Ford neither disclosed nor obtained consent from Ms. Dubay to allow CD to use the editorial photo for advertisement purposes. Ford offered no consideration to Ms. Dubay for allowing CD to use the editorial photo for advertisement purposes.

23. In addition, Ford also breached its fiduciary duty by failing to disclose to Ms. Dubay that perspective clients were interested in meeting for purpose of hiring her for work or were looking to in fact hire her but Ford told them.

## COUNT III (BREACH OF CONTRACT)

24. Plaintiff repeats and re-alleges the prior allegations herein.

25. Ford breached its contract with Ms. Dubay. It failed to obtain any consideration from CD for use of the photo in the advertisement using Ms. Dubay's likeness by CD for itself. Ford also failed to disclose to Ms. Dubay that it gave CD authorization to use the photo for non-editorial purposes.

26. In addition, Ford's conduct was unreasonable. Ms. Dubay had come to New York for the first time in September 2002 when she signed the agreement with Ford. Just as she was becoming known in the industry and had gained regular and substantial employment, Ford unreasonably decided to stop sending her for castings and actively misinformed clients and perspective clients about her whereabouts and availability for work. In addition, Ford failed to disclose to Ms. Dubay that such clients were inquiring about her.

27. As a result of its conduct, Ford breached its management agreement with Ms. Dubay in several respects. First, Ford violated its obligation of good faith and fair dealing by unreasonably refusing to send Ms. Dubay for castings. Since trying to obtain work for Ms. Dubay went to the heart of their agreement, Ford's unreasonable failure to do so constituted a breach of the agreement and violation of the obligation of good faith and fair dealing. Second, it breached the agreement (and its fiduciary duty as managing agent) by failing to disclose inquiries from perspective clients interested in Ms. Dubay for work thereby further acting unreasonably with respect to the purpose of their management agreement. Finally, Ford violated the management agreement by terminating the agreement prior to its term without justification.

## COUNT IV (FRAUD)

28. Plaintiff repeats and re-alleges the prior allegations herein. Ford failed to disclose and omitted to tell Ms. Dubay that Ford was going to give CD a release allowing CD to use the above mentioned likeness of Ms. Dubay for advertising purposes for no consideration. It clearly owed a duty to make the disclosure. Had Ford disclosed their intentions and actions, Ms. Dubay would not have consented to Ford giving the photo away for free for use in the advertisement. Accordingly, Ms. Dubay relied to her detriment that Ford would not give her valuable work and property away for no consideration to her. She also reasonably relied to her detriment that Ford would disclose to her all requests from clients to use her photo for jobs. Indeed, that was the business that Ford was in. As a result of Ford's intentional failure to disclose this material fact and Ms. Dubay's reasonable and detrimental reliance, Ms Dubay was damaged, to wit, she lost the value that she could have obtained for that photo which CD used for its benefit to market its Teen Vogue Magazine. Ms. Dubay also lost the value she would have obtained had Ford disclosed that perspective customers were looking to hire her.

29. Although value of the use of the photos will be demonstrated at trial, for the purposes of the fraud claim, the value of the use of the photo was significant in that CD used the photo to advertise its own magazine on numerous occasions in tear out subscription offers in Teen Vogue. In fact, it valued it so much that it used Ms. Dubay's likeness to identify itself. In addition, CD used

Ms. Dubay's likeness extensively on television commercials and trade magazines in marketing its Teen Vogue publication.

### COUNT V (UNJUST ENRICHMENT)

30. Plaintiff repeats and re-alleges the prior allegations herein. CD must disgorge the value it received without consideration. The release obtained by CD fails for lack of consideration because CD had knowledge that it was obtaining from Ford property for which it was not paying any compensation for. Under the circumstances any reliance by CD on the release would be unreasonable. CD, by not paying reasonable compensation for the use of the photo, did not obtain good title or the right to use the photo, notwithstanding the release due to its clear understanding that Ford exclusively represented Ms. Dubay and that any release Ford gave to use the photo for no consideration was ultimately subject to claims from Ms. Dubay for payment. Accordingly, in good conscience and equity CD may not retain the use of the photo without paying the reasonable value for same.

### DAMAGES

31. Based upon the foregoing, plaintiff was damaged in an amount to be determined at trial but not less than $100,000.00 on each Count except the count for an accounting.

WHEREFORE, based upon the foregoing plaintiff seeks judgment for the claims alleged herein and appropriate damages to be determined at trial but not

less than $100,000.00 on each count except for the count for an accounting and for such other and further relief as this court deems just, proper and equitable.

## JURY DEMAND

Plaintiff hereby requests a jury trial on all issues and claims.

Dated: July 12, 2007
New York, New York

Respectfully submitted,

David E. Aronow, Esq. (DEA-2026)
Attorney for Plaintiff, Camila Dubay
44 Wall Street
6th Floor
New York, New York 10005
(212) 359-1000
daro@mettel.net

DE : TOTAL SAFE-Seguros          FAX :11 3742-1133       06 SET. 2002 11:25   Pág.2

09/05/2002 03:38 FAX 2129661531       FORD MODELS                             ☒002

# FORD MODELS MANAGEMENT AGREEMENT

AGREEMENT made and entered into as of (*Date*) __9/5/02__, by and between (*Name*) __CAMILA DUDAY__ (for convenience hereinafter referred to as "*TALENT*"), and FORD MODELS, INC. (for convenience hereinafter referred to as "*MANAGER*").

In consideration of the mutual covenants and conditions herein contained, the parties hereto agree as follows:

**FIRST: Appointment.**

Talent hereby constitutes and appoints *MANAGER* the exclusive personal manager of *TALENT* for New York City, Los Angeles, Miami, Chicago, Cleveland, Arizona, Toronto, Vancouver, Brazil, Argentina and France in and with respect to advising, counseling promoting and contracting print, runway, television and film work (Hereinafter, such activities are collectively referred to as "the *TALENT*'s services").

As and when requested by *TALENT* during and throughout the term hereof, *MANAGER* agrees to perform for *TALENT* one or more of the services as follows:

(a) Advise and counsel in the selection or consideration of career opportunities, photographers, advertisers and the selection or creation of vehicles for *TALENT*'s talents;
(b) Advise and counsel in any and all matters pertaining to advertising, television and film;
(c) Advise and counsel relative to the adoption of proper format of presentation of *TALENT*;
(d) Advise and counsel with regard to general practices in the modeling and advertising industries;
(e) Send invoices, statements to *TALENT*'s clients, and collect fees for *TALENT*; and
(f) Advise on personal appearance composites and the formation of a portfolio.

*MANAGER* accepts such appointment upon the terms and provisions hereinafter stated. It is understood and agreed that *MANAGER* is not an employment agent. In this connection, *MANAGER* has not promised to procure employment for *TALENT*, and shall not be obligated to secure or to attempt to secure the same hereunder.

It is further understood that *MANAGER* in no manner supervises the professional activities of *TALENT*, nor does it control the terms or conditions of the *TALENT*'s services. Such supervision and control is the subject of the relationship between *TALENT* and the client who employs the *TALENT* to render services. The compensation or compensation rate for *TALENT*'s services shall be determined by *TALENT* after consultation with *MANAGER*.

It is understood that since *MANAGER* is employed by *TALENT*, *MANAGER* will not provide *TALENT* with coverage for Worker's Compensation, State Disability or State Unemployment. It is further understood that *TALENT* is responsible for all such coverage and that responsibility therefor has been assumed by *TALENT* commencing as of the date *MANAGER* was first appointed as Manager of *TALENT*. *TALENT* hereby releases and holds harmless *MANAGER* from any and all claims and/or responsibility with respect to Workmen's Compensation, State Disability, Federal Income Tax, Social Security or State Unemployment coverage or benefits relating to *TALENT*.

It is further understood that *MANAGER* shall not be obliged to pay for any of *TALENT*'s own expenses, such as travel, lodgings, entertaining, wardrobe, makeup, etc. *TALENT* agrees that *MANAGER* shall not be required to make any payments on account of the same or be responsible therefor.

PAGE 1

DE : TOTAL SAFE-Seguros                FAX :11 3742-1133        06 SET. 2002 11:26    Pág. 3

09/05/2002 03:39 FAX 2129661531           FORD MODELS                             ☐003

# FORD MODELS MANAGEMENT AGREEMENT

### SECOND: Term

The term of this Agreement shall be for 2 years, commencing on 06/09, 2002 and terminating on 05/09, 2004. The agreement shall continue for successive 2-year terms, unless *MANAGER* or *TALENT* shall terminate by giving written notice to the other at least sixty (60) days prior to the end of the two-year period then in effect.

### THIRD: Power of Attorney

*TALENT* hereby authorizes and appoints *MANAGER* to be *TALENT*'s agent and attorney-in-fact to;

1. Negotiate, renegotiate, contract and execute for *TALENT*, in the name of *TALENT*, on behalf of *TALENT*, any and all agreements, documents and contracts of *TALENT*'s services in the fields covered by this agreement.

2. Collect and receive sums payable to *TALENT*; endorse *TALENT*'s name upon and deposit in *MANAGER*'s account any and all checks payable to *TALENT* and retain therefrom all sums owing to *MANAGER*.

3. Approve and permit the use of *TALENT*'s name, photograph, likeness and voice for the purposes of advertising and publicity of *TALENT* and/or *MANAGER*.

The foregoing authority and agency granted in the power of attorney is coupled with an interest and shall be irrevocable during the term of this AGREEMENT, and any renewal or extension hereof.

### FOURTH: MANAGER's Fee

In consideration of *MANAGER*'s entering into this Agreement and as compensation for the services to be rendered to *TALENT* by *MANAGER* hereunder, *TALENT* agrees to compensate *MANAGER* in an amount equal to twenty (20%) percent of any and all gross moneys or other considerations which *TALENT* may receive as a result of agreements and any renewals or renegotiations thereof which agreements were commenced during the term (Paragraph SECOND) in the print modeling and advertising fields.

*TALENT* is also aware that *MANAGER* is entitled to receive a service charge from some and/or all of the clients who may utilize *TALENT*'s services. *TALENT* agrees that this service charge shall be an additional inducement for *MANAGER* to act on *TALENT*'s behalf.

### FIFTH: Security Interest

*TALENT* grants to *MANAGER* and/or its named affiliates and their successors and/or assigns, as security for the timely payment and performance of all obligations, liabilities and indebtedness now or hereafter owing by *TALENT* to *MANAGER* (including without limitation the payment of fees and the repayment of advances described in paragraphs FOURTH and SIXTH, respectively), a first priority security interest in all *TALENT*'s rights in and to all accounts, contract rights, receivables and monies due and to become due to *TALENT* (collectively "Accounts") under any agreement arising out of *TALENT*'s rendering of modeling services, and proceeds thereof whether now existing or hereafter created, and *TALENT* hereby directs that any such proceeds may be applied to any obligation owed by *TALENT* to *MANAGER* and/or its named affiliates. *TALENT* will on

DE : TOTAL SAFE-Seguros                FAX :11 3742-1133          06 SET. 2002 11:27    Pág. 4

09/05/2002 03:40 FAX 2129661531        FORD MODELS                          ☒004

## FORD MODELS MANAGEMENT AGREEMENT

request execute UCC financing statements and other documents in furtherance of the security interest hereby granted. *TALENT* will give prior written notice to *MANAGER* if *TALENT* changes residence. *TALENT* will not grant, suffer or permit to exist any other lien on or security interest in the Accounts.

**SIXTH: Collection**

*MANAGER* will take all reasonable steps to collect amounts due to *TALENT* from *TALENT*'s clients in accordance with the terms of signed vouchers submitted by *TALENT* to *MANAGER*. The risk of collection in connection with such vouchers, and the legal costs incidental thereto, shall be borne entirely by *TALENT*. If *MANAGER*, at its sole discretion, loans moneys to *TALENT* against any voucher, and *MANAGER* does not collect the full amount of any voucher, *TALENT* will repay the amount of any loan not collected by *MANAGER*, and *MANAGER* may, at *MANAGER*'s election, deduct the amount of such unpaid loan from any amounts collected by *MANAGER* on behalf of *TALENT* at that time or thereafter. If after repayment by *TALENT*, *MANAGER* receives payments with respect to such voucher, *MANAGER* will pay to *TALENT* any such amount up to the amount of *TALENT*'s repayment to *MANAGER*, net of any legal fees incurred in connection with *MANAGER*'s collection efforts.

**SEVENTH: Agreement Breach**

In the event *TALENT* claims *MANAGER* has committed a breach of this Agreement, *TALENT* shall specify to *MANAGER*, in writing, the facts constituting such breach. Such specification shall be given to *MANAGER* within 10 days of the time *TALENT* learns of the purported breach. *MANAGER* shall have a period of 30 days following receipt of such written specification to cure any alleged breach.

**EIGHTH: Relationship**

It is understood and agreed that the relationship between *MANAGER* and *TALENT* is that of independent contractors, and not an employment relationship. *MANAGER*'s services are not exclusive to *TALENT* and *MANAGER* may, at *MANAGER*'s discretion, perform the same or similar services for other talent during the term of this agreement, or any renewal or extension thereof.

**NINTH: Notices**

All notices required under this agreement shall be sent by registered mail and addressed as follows, or such other address or addresses as *TALENT* may furnish to *MANAGER* from time to time:

TALENT: _Camila Dutra_                          MANAGER: _____
Address: _Recomendador Gabriel Casset_           Ford Models, Inc., Att: Bob Strand
_nº 132_                                         142 Greene Street
                                                 New York, NY  10012

**TENTH: Agreement Exclusivity**

*TALENT* hereby warrants that *TALENT* has the right to make and enter into this Agreement, and that *TALENT* is not now under contract to any personal manager or agent or business agent or business manager with respect to *TALENT*'s services in the modeling field in the territory which is the subject of this agreement.

PAGE 3

DE : TOTAL SAFE-Seguros          FAX :11 3742-1133         06 SET. 2002 11:28    Pág.5

09/05/2002 03:41 FAX 2129661531    FORD MODELS                              ☑005

# FORD MODELS MANAGEMENT AGREEMENT

**ELEVENTH: Agreement Terms**

*TALENT* and *MANAGER* agree that they have had discussions concerning this written Agreement. They understand that all the discussions and the hopes expressed in the discussions were merely preliminary negotiations and statements and promises made are not binding. Promises by *TALENT* to *MANAGER* or by *MANAGER* to *TALENT* not contained in this Agreement shall be considered null and void, and as if they never existed. This Agreement is the only agreement of the parties and there is no collateral agreement (oral or written) between the parties in any manner relating to the subject matter hereof. This agreement can be amended or modified only by an instrument in writing signed by both *TALENT* and *MANAGER*.

**TWELFTH: Confidentiality**

*TALENT* and *MANAGER* agree that the terms of this Agreement shall remain confidential and shall not be disclosed to any person or entity, except solely by *TALENT* to his/her immediate family and by either *TALENT* or *MANAGER* as may be required for obtaining legal or tax advice, for the filing of income tax returns or required financial disclosures or as may be required by law or in any proceeding to enforce this Agreement. *TALENT* and *MANAGER* agree that they each shall not make, or cause to be made, any statement, observation or opinion, or communicate any information (whether oral or written) that disparages the reputation or business of the other. Nothing herein shall be deemed to preclude either *TALENT* or *MANAGER* from providing truthful testimony or information pursuant to subpoena, court order or similar legal process.
*TALENT* and *MANAGER* agree that any violation of this paragraph shall be a material breach entitling the non-breaching party to recover actual damages sustained by reason of the breach, and to obtain injunctive relief without the necessity of posting any bond or security, in either case without otherwise affecting any other rights or remedies available to an aggrieved party at common law or otherwise.

WHEREFORE, the parties hereto set their hands at New York, N.Y. on the day and year first above written.

TALENT *(Signature)*: _Carinly Kisbay_
Address: _R Comendador Gabriel_
_Galfat no 132_

Authorized Signature for Talent under 18 Years of Age:
*(Signature)*
_Maria de Lourdes Dulay_

Telephone: _____
Soc. Sec. No. _____
Date of Birth: *(Month/Day/Year)* _30/12/85_

MANAGER: *(Signature)* _____

_Parents_

PAGE 4

# $1 an issue plus a free gift!

**Finally a sophisticated fashion magazine just for teens.** From the publishers of VOGUE. With all the great photography, all the great style, all the great fashion you would expect from a magazine named TEEN VOGUE.

Go on a TEEN VOGUE **shopping spree.** See TEEN VOGUE'S view of **who's wearing what and where.** Try TEEN VOGUE'S **do-it-yourself fashion** and save tons of $$$$. **Hear what people are talking about.**
Get a FREE GIFT too!

**RUSH! FREE GIFT ORDER!**

**BUSINESS REPLY MAIL**
FIRST-CLASS MAIL    PERMIT NO. 107    BOONE IA
POSTAGE WILL BE PAID BY ADDRESSEE

NO POSTAGE NECESSARY IF MAILED IN THE UNITED STATES


teenVOGUE
PO BOX 37729
BOONE IA 50037-2729


YOUR FREE GIFT

Do it the stylish way.
Do it the
TEEN VOGUE way.

Tear out this card and mail today!